[Cite as *Barton v. Barton* , 2015-Ohio-31.]

**IN THE COURT OF APPEALS OF OHIO**
**SECOND APPELLATE DISTRICT**
**GREENE COUNTY**

| | | |
|---|---|---|
| DOUGLAS C. BARTON | : | |
| | : | Appellate Case No. 2014-CA-21 |
| Petitioner-Appellant | : | |
| | : | Trial Court Case No. 2013-DV-193 |
| v. | : | |
| | : | |
| KEESHA A. BARTON | : | (Domestic Relations Appeal from |
| | : | Common Pleas Court) |
| Respondent-Appellee | : | |
| | : | |

. . . . . . . . . . .

O P I N I O N

Rendered on the 9th day of January, 2015.

. . . . . . . . . . .

DOUGLAS C. BARTON, 437 Warwick Place, Fairborn, Ohio 45324
        Petitioner-Appellant-Pro Se

CHARLES W. SLICER, III, Atty. Reg. No. 0059927, 111 West First Street, Suite 518
Dayton, Ohio 45402
        Attorney for Respondent-Appellee

. . . . . . . . . . . . .

FAIN, J.

        1        Petitioner-appellant Douglas Barton appeals from a Civil Protection Order

entered against him by the Greene County Common Pleas Court, Domestic Relations Division. He raises thirteen assignments of error. Because we conclude that there is insufficient evidence in the record that respondent-appellee Keesha Barton was placed, by force or threat of force, in fear of imminent serious physical harm, the civil protection order from which Mr. Barton appeals is Reversed.

## I. The Course of Proceedings

2 Keesha Barton and Douglas Barton were married in July 2012. Ms. Barton filed a petition for domestic violence civil protection order on November 27, 2013. An ex parte order of temporary protection was entered that same day, and a hearing was scheduled for December 4, 2013. On the date of the hearing, counsel for Ms. Barton filed a motion for continuance citing the fact that Mr. Barton had filed a petition for protection and the ex parte order of temporary protection had just been received, along with a notice of a hearing date set for December 13. Counsel requested that both hearings be combined and reset for another date.

3 The motion to continue was granted, and a new hearing date of February 7, 2014, was set for both cases. The record does not contain any objection by Mr. Barton. The hearing date was converted to a pre-trial conference, attended by counsel for both parties. A new hearing date was set for April 14, 2014 at which both parties were represented by counsel. Following the hearing, the trial court entered a protection order on behalf of Ms. Barton. The trial court stated that it found credible Ms. Barton's testimony that Mr. Barton had "engaged in a pattern of conduct that has caused [Ms. Barton] fear of immminant [sic] harm or danger and has led to mental distress."

Mr. Barton, acting pro se, appeals.

## II. There Is Insufficient Evidence in the Record that Ms. Barton Was Placed, by Force or Threat of Force, in Fear of Imminent Serious Physical Harm

Barton's First Assignment of Error states:

APPELLANT'S JUDGMENT AGAINST HIM FOR TEMPORARY/PERMANENT CIVIL PROTECTION ORDER WAS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE AS DEFINED BY ORC 3113.31, THE TRIAL COURT ERRED WHEN GRANTING APPELLEE'S PROTECTION ORDER.

Mr. Barton contends that the evidence does not support the entry of a protection order against him. Mr. Barton's argument in this assignment of error, while styled as a weight of the evidence issue, is actually centered on his claim that Ms. Barton did not submit evidence sufficient to establish the elements necessary for the issuance of the protection order.

Under R.C. 3113.31(E)(1), a court may grant a protection order to "bring about a cessation of domestic violence." When a trial court grants a protection order, it must find that the "petitioner has shown by a preponderance of the evidence that petitioner or petitioner's family or household members are in danger of domestic violence." *Felton v. Felton*, 79 Ohio St.3d 34, 679 N.E.2d 672 (1997), at paragraph two of the syllabus. Domestic violence is defined in pertinent part by R.C. 3113.31(A)(1) as "[p]lacing another person by the threat of force in fear of imminent serious physical harm or committing a violation of section 2903.211 or 2911.211 of the Revised Code".

Although "force" is not defined in R.C. 3113.31, it is defined elsewhere for

purposes of the Ohio Revised Code as "any violence, compulsion, or constraint physically exerted by any means upon or against a person or thing." R.C. 2901.01(A)(1). With regard to imminence, this court has previously held that because civil protection orders are intended to prevent violence before it happens, imminence does not require an offender to carry out a threat immediately or to be in the process of carrying it out. *Young v. Young*, 2d Dist. Greene No. 2005-CA-19, 2006-Ohio-978, ¶ 105. Instead, "the critical inquiry under the statute is whether a reasonable person would be placed in fear of imminent (in the sense of unconditional, non-contingent), serious physical harm. This inquiry necessarily involves both subjective and objective elements. * * * Therefore, we must determine whether [the petitioner] * * * had a reasonable belief that * * * [the offender] would cause her imminent, serious physical harm." *Id*.

9        Additionally, R.C. 2901.01(A)(5) defines "serious physical harm to persons"  as any of the following:

(a) Any mental illness or condition of such gravity as would normally require hospitalization or prolonged psychiatric treatment;

(b) Any physical harm that carries a substantial risk of death;

(c) Any physical harm that involves some permanent incapacity, whether partial or total, or that involves some temporary, substantial incapacity;

(d) Any physical harm that involves some permanent disfigurement or that involves some temporary, serious disfigurement;

(e) Any physical harm that involves acute pain of such duration as to result in substantial suffering or that involves any degree of prolonged or intractable pain."

R.C. 2901.01(A)(5).

10      Our review is limited to determining whether the issuance of the protection order is supported by sufficient competent and credible evidence. *Young v. Young*, 2d Dist. Greene No. 2005-CA-19, 2006-Ohio-978, ¶ 22.

11      The facts relevant hereto are taken from the transcript of the hearing. Ms. Barton testified that in August 2012, she had received information that caused her concern for Mr. Barton's safety. Therefore, she went to another home owned by Mr. Barton, removed his collection of guns, and took them to her house. She testified that she then received a text from Mr. Barton telling her that she had "better be ready for a s–t storm." Tr., p. 23. Later, Mr. Barton came to the marital residence. Ms. Barton had locked him out. She testified that she told him not to come inside, but he forced a door open with a crowbar. Ms. Barton testified that Mr. Barton screamed obscenities at her, and told her she better not go to sleep. A recording of this fight was introduced at trial. Ms. Barton testified that this event caused her "imminent fear." Tr., p. 34. When asked why she did not call the police on that date, and did not file her petition for three months thereafter, Ms. Barton stated that Mr. Barton came back home after "things cooled down." *Id.*

12      Ms. Barton testified that in October 2012, Mr. Barton "threw [her] around the living room." Tr. p. 8. Further, she testified that on Thanksgiving Day 2012, Mr. Barton grabbed her, pushed her, and spit in her face. Ms. Barton sought her first civil protection order on November 27, 2012. She voluntarily dismissed that petition in December 2012. She testified that she dismissed the petition in exchange for Mr. Barton's agreement to get counseling.

13      There is no clear evidence of any further violent interaction between the parties until June of 2013. Ms. Barton submitted an exhibit showing text messages between her and Mr.

Barton on June 24, 25, and 26, 2013. On June 24, the parties discussed deck stain. On June 25, 2013, the parties went to lunch together at Ms. Barton's request, which she made via text message. According to Ms. Barton, Mr. Barton picked her up for lunch and drove her to a restaurant parking lot where he yelled at her. After lunch she texted, "I love you," to Mr. Barton.

14     The remainder of the text messages in the exhibit occur on June 26. The exhibit demonstrates that between 8:28 a.m. and noon, Ms. Barton texted Mr. Barton 46 times. The parties appear to have been at work during this time. Their offices were in close proximity. In the texts, both parties use profanity. Ms. Barton texts that she will not "stop" until Mr. Barton "fixes" something he did, which is never identified in the texts. The texts also indicate that she attempted to contact him by telephone. Mr. Barton responded to most of the texts. None of his texts contain threats; however, in one of his reply texts, Mr. Barton indicates that if Ms. Barton does not stop harassing him, he will report her to her supervisor. Immediately thereafter, she texted that he was threatening her. She texted Mr. Barton another 15 times between 12:20 p.m. and 2:29 p.m. During the lunch hour, she texted him that he was staying in his office to avoid her. Mr. Barton did not respond to any of the last 15 text messages. In her final texts during that time period, Ms. Barton indicated that she was at Mr. Barton's home. That same afternoon, Ms. Barton was arrested and charged with domestic violence. A temporary protection order was entered against her.

15     Ms. Barton testified that in August 2013, she learned that Mr. Barton made a posting on his Facebook page in which he stated, "silence is golden, duct tape is silver." A review of the exhibit submitted by Ms. Barton shows a screen-shot of Mr. Barton's Facebook profile picture, which depicts a woman, not alleged to be Ms. Barton, bound and gagged with duct

tape. Mr. Barton testified that the picture was taken from a movie and represented the fact that he "was getting some peace and quiet. That I wasn't having arguments any more." Tr., p. 44. Also during August, Mr. Barton filed for divorce.

16 Ms. Barton finally testified that for the "last several months" before the hearing, Mr. Barton had been telling her to "keep [her] mouth shut," and that he had filed a civil suit against her.

17 In November 2013, the domestic violence charge against Ms. Barton was amended to a charge of disorderly conduct. Ms. Barton entered a plea of no contest to the amended charge on November 26, 2013. The judgment entry indicates that it terminated the order of temporary protection. The next day Ms. Barton filed her second petition for a protection order, based upon the same allegations contained in the original petition, as well as the subsequent events set forth above.

18 We conclude from the evidence in the record that the Bartons have a dysfunctional and volatile relationship. Both parties have exhibited poor behavior. But the issue is whether Ms. Barton was in fear of imminent serious physical harm caused by threat of force.

19 Ms. Barton's testimony at the hearing regarding her fear consists of her generalized statement that she is afraid that her safety is in imminent and continued risk. We conclude that the evidence in the record does not support this claim. Following the August 2012 incident, the parties reconciled and resided together again, once things "cooled down." While two of the 2012 incidents did involve physical contact, Ms. Barton indicated that Mr. Barton did not cause her physical harm. Furthermore, it appears that the parties again reconciled and continued their relationship until June 2013, without any incidents. The record regarding the

June incidents do not demonstrate imminent fear. Ms. Barton initiated the text conversations, discussed such mundane items as deck stain, and told Mr. Barton to take her out to lunch.

20    There is no evidence of any physical act of force or threat of force since November 2012. It is clear from the text messages that Ms. Barton was the person precipitating the altercation that caused her arrest in June 2013. There is no evidence of physical contact between the parties following Mr. Barton's filing for divorce in August 2013. Ms. Barton made a generalized claim that Mr. Barton continuously told her to keep her mouth shut for a period of several months, but there is no evidence that these statements were made during face-to-face encounters or via telephone, text or e-mail. While the Facebook posting is distasteful, it was not transmitted to Ms. Barton, and does not set forth any explicit threat of force. In short, the evidence regarding the contact between the parties in 2013 does not constitute sufficient, credible evidence to support a finding that Ms. Barton was placed, by force or threat of force, in fear of imminent serious physical harm. Accordingly, the First Assignment of Error is sustained.

### III.   Mr. Barton's Remaining Assignments of Error Are Moot

21    Barton's remaining assignments of error are as follows:

APPELLANT'S FAILURE TO RECEIVE A TIMELY FULL HEARING WITHIN 10 DAYS, IN VIOLATION OF ORC 3113.31 AND U.S. CONSTITUTION 5TH, 6TH AND 14TH AMENDMENTS, THE TRIAL COURT ERRED WHEN NOT FOLLOWING OHIO REVISED CODE.

APPELLANT'S JUDGMENT AGAINST HIM FOR TEMPORARY/ PERMANENT CIVIL PROTECTION ORDER WAS AGAINST THE RIGHTS

OF VICTIMS OF CRIMES, IN VIOLATION OF ARTICLE 1, SECTION 10a OF THE OHIO CONSTITUTION, THE TRIAL COURT ERRED WHEN THEY GRANTED THE CIVIL PROTECTION ORDER BY FAILING TO PROVIDE THE APPELLANT A VICTIM OF A CRIME (COMMITTED BY THE APPELLEE) FAIRNESS, DIGNITY AND RESPECT.

THE APPELLEE'S ATTORNEY (BRIAN PENICK) FAILED TO FILE NOTICE OF APPEARANCE BEFORE OR AFTER MOTION FOR CONTINUANCE; THE APPELLEE'S EX PARTE HEARING WAS PRO SE. THE TRIAL COURT ERRED WHEN GRANTING THE CONTINUANCE, NO GOOD CAUSE WAS SHOWN.

THE TRIAL COURT ERRED BY LISTING APPELLEE'S ATTORNEY PENICK AS APPELLANT'S ATTORNEY

APPELLANT'S JUDGMENT AGAINST HIM FOR PERMANENT/ TEMPORARY CIVIL PROTECTION ORDER WAS AGAINST THE U.S. CONSTITUTION 2ND AMENDMENT. THE TRIAL COURT ERRED WHEN GRANTING APPELLEE'S PROTECTION ORDER, THERE WAS NO SPECIFIC HEARING ON TAKING AWAY 2ND AMENDMENT RIGHTS.

APPELLANT'S JUDGMENT AGAINST HIM FOR PERMANENT/ TEMPORARY CIVIL ORDER WAS AGAINST THE U.S. CONSTITUTION 8TH AMENDMENT. THE TRIAL COURT ERRED WHEN THEY GRANTED THE CIVIL PROTECTION ORDER, THE JUDGMENT IS CRUEL AND UNUSUAL GIVEN THAT THE APPELLANT WAS THE VICTIM OF A CRIME

AS COMMITTED BY THE APPELLEE.

APPELLANT'S JUDGMENT AGAINST HIM FOR PERMANENT/ TEMPORARY CIVIL ORDER [SIC] WAS AGAINST THE U.S. CONSTITUTION 4TH AMENDMENT.

APPELLANT'S JUDGMENT AGAINST HIM FOR PERMANENT/ TEMPORARY CIVIL PROTECTION ORDER WAS AGAINST THE U.S.C. 42 § 1983.

APPELLANT'S JUDGMENT AGAINST HIM FOR PERMANENT/ TEMPORARY CIVIL PROTECTION ORDER WAS AGAINST THE U.S.C. 42 § 1985.

APPELLANT'S JUDGMENT AGAINST HIM FOR PERMANENT/ TEMPORARY CIVIL PROTECTION ORDER WAS AGAINST THE U.S.C. 42 § 1986.

APPELLANT'S JUDGMENT AGAINST HIM FOR PERMANENT/TEMPORARY CIVIL PROTECTION ORDER WAS AGAINST THE OHIO RULES OF PROFESSIONAL CONDUCT (FOR LAWYER'S) [SIC] RULE 1.2[9], [10]; RULE 3.4(a), (b), (d), (e); RULE 3.5 (a)(1), (3); RULE 4.1 (a), (b).

APPELLANT'S JUDGMENT AGAINST HIM FOR PERMANENT/ TEMPORARY CIVIL PROTECTION ORDER WAS AGAINST THE OHIO CODE OF JUDICIAL CONDUCT - CANNON 1 LACK OF INTEGRITY, IMPARTIALITY AND APPEARANCE OF IMPROPRIETY. RULE 1.1 THE

TRIAL COURT DID NOT COMPLY WITH THE LAW. RULE 1.2[5]; CANNON 2 RULE 2.2, RULE 2.3(A),(C); RULE 2.5(A), (B); RULE 2.6(A); RULE 2.12(A), (B).

22    In view of our disposition of Mr. Barton's First Assignment of Error, his remaining assignments of error are overruled as moot.

## IV.  Conclusion

23    Mr. Barton's First Assignment of Error having been sustained, and his remaining assignments of error having been overruled as moot, the civil protection order entered against him, from which this appeal is taken, is Reversed.

. . . . . . . . . . . . .

HALL and WELBAUM, JJ., concur.

Copies mailed to:

Douglas C. Barton
Charles W. Slicer, III
Hon. J. Timothy Campbell (sitting by assignment)